**Aaron SELL, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**Nos. 7468, 7518.**

United States Court of Appeals
Tenth Circuit.

Sept. 3, 1964.

Rehearing Denied Oct. 9, 1964, in No. 7468.

Byron M. Gray, Topeka, Kan. (Marion D. Sell, Denver, Colo., on the brief), for appellant in No. 7468.

Elmer Hoge, Asst. U. S. Atty. (Newell A. George, U. S. Atty., on the brief), for the United States in No. 7468.

Marion D. Sell, Denver, Colo., for appellant in No. 7518.

David L. Rose, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., Lawrence M. Henry, U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, on the brief), for the United States in No. 7518.

Before PHILLIPS and BREITEN-STEIN, Circuit Judges, and CHRISTENSEN, District Judge.

ORIE L. PHILLIPS, Circuit Judge.

*I—No. 7468*

Sell was charged by indictment in the United States District Court for the District of Kansas with a violation of 15 U.S.C.A. § 714m(a). The indictment in part read:

"That on or about January 1, 1956, * * * Aaron Sell did make a statement knowing it to be false, for the

purpose of influencing the action of the Commodity Credit Corporation, an agency of the Department of Agriculture and the United States of America, and for the purpose of obtaining for himself money and property and other things of value, in that he did make, file and cause to be filed with the said Commodity Credit Corporation through the Greeley County Committee of the Farmers Home Administration, pursuant to regulations governing the Emergency Feed Program a certain application for assistance under the said Emergency Feed Program wherein he stated (1) that he had practically no feed at all; (2) that he did not have a supply of feed on hand to maintain his basic herd of livestock until March 1, 1956; (3) that he needed 259,000 pounds of surplus grains designated by the Commodity Credit Corporation; (4) that without the assistance applied for under the Emergency Feed Program he would be unable to maintain his basic foundation herd, which statements and representations therein made the said defendant then and there knew were false."

On a trial to the court Sell was found guilty, fined $7,500, sentenced to a term of imprisonment of one year and one day, execution of which was suspended, and placed on probation for a period of two years. He has appealed.

At all times here material Sell was the owner of large amounts of farm lands in Kansas and Colorado. He also owned a herd of pedigreed cattle in Greeley County, Kansas, which he had built up over a period of 20 years.

In 1955, as the result of a severe drought, parts of Eastern Colorado and Western Kansas, including Greeley County, Kansas, were declared by the President of the United States to be disaster areas entitled to share in the Emergency Feed Program.

On January 1, 1956, Sell, on a form provided by the Farmers Home Adminis-

tration, made the application alleged in the indictment. In such application Sell represented that he had a basic beef herd of 431; that he owned no other livestock; that his tons of hay on hand were "practically none—only what shipped in recently"; that his tons of silage on hand were "limited"; and that he had no feed crops growing. A space on the form on which "other" feed on hand was to be indicated was left blank.

The application contained the following certification, which Sell executed:

"I certify that the above information is correct and that my principal occupation is farming or ranching, and that I do not have a supply of feed on hand to maintain my basic herd of livestock, * * * until March 1, 1956. In order to provide a supply of feed for this livestock, I will need * * * 259000 pounds of SURPLUS GRAINS DESIGNATED BY THE COMMODITY CREDIT CORPORATION in addition to the feed I have on hand and that to be harvested during that period, and hereby make application for the purchase of that amount of feed under the Emergency Feed Program. Without the assistance applied for under the Emergency Feed Program I will be unable to maintain my basic foundation herd and to continue the livestock operation which I have been conducting for 20 years."

The Greeley County Committee considered such application and on January 4, 1956, determined that Sell was eligible for assistance under the Emergency Feed Program. It approved his application to the extent of 156,400 pounds of surplus grains designated by the Commodity Credit Corporation. Sell was then issued Farmers Purchase Order No. 147 and Farmers Purchase Order No. 148, each of which authorized him to purchase 78,200 pounds of designated surplus feed grains from a feed dealer who had entered into a "Feed Dealers Agreement—1955 Emergency Feed Program" with the Commodity Credit Corporation, applying such

certificates to the purchase price to the extent of $1.00 per hundred-weight.

Sell was the president and majority shareholder of Walkinghood Grain, Inc., hereinafter referred to as Walkinghood. Of the 1,000 shares of outstanding Walkinghood stock, Sell owned 700 shares, his children owned 45 shares, his wife owned 10 shares, his daughter-in-law owned 10 shares, and the corporation held 225 shares as treasury stock. Walkinghood owned and Sell operated for it a grain elevator in Greeley County, Kansas, which purchased, stored and sold grain. The elevator had a capacity of 100,000 bushels. When grain was delivered to the elevator by a farmer, he was credited on the books of Walkinghood with the number of pounds of grain he had delivered, but the grain became the property of Walkinghood and might be sold by it immediately or retained until some later time. The farmer was accorded the privilege of selecting a future date for payment for the grain he had delivered, thereby giving him the benefit of possible increases in market prices. When he did elect a future date for payment, the amount of payment at the market price on that date was entered opposite the entry showing the amount of grain he had delivered. In order to protect itself from such future liability, and for purposes of speculation Walkinghood bought or sold grain short according to its estimate of what the future grain market would be. The secretary of Walkinghood testified that the corporation was in the business of dealing in grain futures and selling grains short.

Sell managed the Walkinghood elevator, accepted delivery of grain brought to the elevator by farmers in the area, and made the entries on the books of Walkinghood showing the quantities of grain delivered to the elevator.

Walkinghood had not entered into a Feed Dealers Agreement with the Commodity Credit Corporation and therefore could not redeem Emergency Feed Program Purchase Orders.

From October 14, 1955, through December 20, 1955, the Walkinghood elevator received 537,955 pounds of milo from 22 farmers in the area and 13 of such farmers were tenants of Sell under sharecrop leases. During the same period 212,750 pounds of milo was sold from the Walkinghood elevator, leaving 325,205 pounds in such elevator. Of the 537,955 pounds of milo delivered to the elevator, 130,718 pounds were credited to Sell's own account as his rent share of the crops of his tenants.

In addition, Sell ultimately paid, with his own check, rather than with a Walkinghood check, for 232,701 pounds of the milo delivered to the elevator.

One of Sell's tenants, Meyer, retained 9,880 pounds of milo in bins on his own farm and another tenant, Brunswig, retained Sell's rent share of milo, 7,440 pounds, in a quonset hut on his farm. Neither of such amounts of milo are included in the 537,955 pounds of milo referred to above as having been received by the Walkinghood elevator in 1955. Meyer's tenant share of the 9,880 pounds of milo kept on his farm was ultimately paid for by Sell with his own check.

On January 11 or 12, 1956, Sell contacted the manager of the Greeley County Grain Co., hereinafter referred to as Greeley, a feed dealer authorized to redeem Farmers Purchase Orders, and told the manager that he had some "drought certificates" to exchange for milo, but that the milo in the Walkinghood elevator was of better quality than that available from Greeley and requested Greeley to buy milo from Walkinghood, weigh it on its scale without dumping it, and transfer it to Sell in exchange for his Farmers Purchase Orders and a cash payment. The manager discussed such arrangement with his employer, who stated, "You had better have them dump it through the elevator and that would be legal."

Thereafter, commencing on January 12, 1956, Sell caused 15 truckloads of milo, weighing 166,440 pounds, to be delivered by Walkinghood to Greeley, and in addition one load of 9,880 pounds from Meyer's farm and one load weighing 7,440 pounds from Brunswig's farm, to

be delivered to Greeley. As a load was brought in, it was weighed, dumped into a pit, run into an overhead bin, dumped back into the same truck, and hauled to Sell's farm until 156,400 pounds had been delivered.

Greeley paid Walkinghood $1.75 per hundredweight for the milo, with two checks. One of such checks, dated February 21, 1956, in the amount of $2,584.75, was negotiated by Sell and treated by him as a loan to him from Walkinghood. He repaid the loan to Walkinghood on March 14, 1956.

Sell paid Greeley $1.85 per hundredweight for the 156,400 pounds of milo delivered to his farm. The payment was made by redeeming his Farmers Purchase Orders No. 147 and No. 148 at the rate of $1.00 per hundredweight and Sell's check in the amount of $1,329.40.

The evidence showed that Sell completely dominated Walkinghood and dealt with and disposed of the grain stored in the Walkinghood Elevator for his own use and advantage as he saw fit to do.

The trial court found that Sell filed an application for emergency feed with the Greeley County Committee on January 1, 1956; that in his application he represented that he did not have a supply of feed on hand to maintain his basic herd of livestock until March 1, 1956; that he would need 259,000 pounds of surplus grains in addition to the feed he had on hand, and that without the assistance applied for he would be unable to maintain his basic foundation herd; that such statements were false and Sell knew them to be false when he made them; that Sell at all times exercised complete dominion and control over the grain received in the Walkinghood elevator; that such grain was subject to his use and was in fact used by him in whatever manner that suited his convenience and advantage; that when the grain was deposited with the elevator it was done with the understanding that Sell would speculate on the prospect of the price of grain increasing in the event the drouth continued and feed became more scarce, in which event he would then obtain payment at its enhanced value for the grain which he had systematically accumulated through purchases and from collections of rent; that Sell caused 17 truckloads of grain to be hauled from the Walkinghood elevator to Greeley, which consisted of 15 loads from Walkinghood, one load of 7,440 pounds from his tenant, Brunswig, and one load of 9,880 pounds from his tenant, Meyer; that Greeley at Sell's direction issued its check dated February 21, 1956, in payment for such grain to Walkinghood, in the amount of $2,584.75, and its check dated March 16, 1957, in the amount of $657.30; that Greeley paid for such grain at the rate of $1.75 per hundredweight, and received payment from Sell at the rate of $1.85 per hundredweight, receiving 10 cents per hundredweight for handling the grain; that the purchase orders redeemed by Sell totaled $1,564 in value; that the $2,584.75 Greeley check was received by Sell, endorsed by him on behalf of Walkinghood and deposited in his own personal bank account; that Sell later repaid such money to Walkinghood; that the County Committee was not familiar with Sell's holdings and resources at the time it approved his application; that the County Committee was not aware he had been acquiring grain at the Walkinghood elevator for the purpose of speculation; that the County Committee believed and acted upon the representations contained in his application to the damage of the United States, and relied upon representations of Sell in considering the application and based its favorable decision on the statements contained in such application. The court concluded that Sell made the false statements contained in his application of January 1, 1956, knowing them to be false, for the purpose of influencing the action of the Commodity Credit Corporation and for the purpose of obtaining for himself money and property and other things of value.

15 U.S.C.A. § 714m(a) provides in material part as follows:

"Whoever makes any statement knowing it to be false, * * * for

the purpose of influencing in any way the action of the Corporation, [Commodity Credit Corporation] or for the purpose of obtaining for himself or another, money, property, or anything of value, under sections 714–714o of this title, or under any other Act applicable to the Corporation, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment by not more than five years, or both."

Sell contends that the trial court erred in ignoring the corporate entity of Walkinghood in treating the grain owned by Walkinghood as belonging to Sell. We do not agree.

Corporate entity may be disregarded in cases where not to do so will defeat public convenience, justify wrong, protect fraud or defend crime.[1] And the separate entity of a corporation and the persons who compose it "may, in a proper case, be cast aside and disregarded if it appears that the corporation is merely the business conduit through which an individual does business, and to recognize the separate entity of the corporation would bring about a fraud upon third parties."[2]

It is clear that Sell used Walkinghood as a means of carrying on his own personal business and speculating in grain. Of the grain delivered to the Walkinghood elevator during the times here involved, approximately 24 per cent was his own grain, which he received as his rent share of his tenants' crops and an additional 43 per cent of such grain was paid for by Sell under circumstances from which it is reasonable to infer and from which the trial court found that Sell purchased the accounts of the farmers for his own purposes of speculation. And the very transaction which is the subject of the indictment, wherein Sell caused 15 truckloads of Walkinghood grain to be delivered to Greeley, weighed, dumped, run into an overhead bin, dumped back into the same trucks and delivered to Sell, clearly shows that Sell used Walkinghood as a device for carrying out his own purposes.

We agree with the trial court that the grain held in the Walkinghood elevator was subject to use by and was in fact used by Sell in whatever manner that suited his convenience and advantage and that Sell had complete dominion and control over 325,205 pounds of grain at the time he applied for emergency feed on January 1, 1956.

To consider the grain that Sell, himself, treated as his own property as belonging to Walkinghood would be of no substantive purpose, other than to defend the criminal act of Sell. It would permit him to turn the Emergency Feed Program into a direct cash dole, since the net result of his transaction with Greeley was to allow him to keep his own grain and at the same time to convert his Purchase Orders into cash.

There can be no doubt that the statements made by Sell on January 1, 1956, that he did not have a supply of feed on hand to maintain his basic herd of livestock until March 1, 1956, and that he needed 259,000 pounds of surplus grains, were false and that he knew such statements were false when he made them.

The false statements knowingly made by Sell in his application were made by him for the stated purpose of obtaining Farmers Purchase Orders for surplus grain. Such orders were fully negotiable through an authorized feed dealer and were valuable items of property. Moreover, since the application was made by Sell for the purpose of obtaining such purchase orders, he is presumed to have intended that the County Committee

1. Boatright v. Steinite Radio Corp., 10 Cir., 46 F.2d 385, 388; Maloney Tank Mfg. Co. v. Mid-Continent Petroleum Corp., 10 Cir., 49 F.2d 146, 150; Dunnett v. Arn, 10 Cir., 71 F.2d 912, 918; Henry v. Dolley, 10 Cir., 99 F.2d 94, 97; Fitzgerald v. Central Bank & Trust Company, 10 Cir., 257 F.2d 118, 120.

2. Warner Bros. Theatres v. Cooper Foundation, 10 Cir., 189 F.2d 825, 830.

would rely on and be influenced by the false statements contained therein.[3]

Other contentions made by counsel for Sell are clearly without merit.

## II—No. 7518

Subsequent to the filing of the indictment in case No. 7468, the United States brought this action against Sell in the United States District Court for the District of Colorado, to recover double damages and a $2,000 penalty under the False Claims Act, 31 U.S.C.A. § 231 et seq. After a pretrial hearing, Sell and the United States each moved for summary judgment. The court granted the motion of the United States and denied the motion of Sell. Judgment was entered against Sell in the amount of $5,128 and he has appealed.

In its first cause of action the United States alleged that on January 1, 1956, Sell made application to the Greeley County, Kansas, Farmers Home Administration for 259,000 pounds of designated surplus grains to be used as drought emergency feed under the 1955 Emergency Feed Program; that in his application he falsely and fraudulently certified that he had practically no feed at all, that he did not have a supply of feed on hand to maintain his basic herd of livestock until March 1, 1956; that he needed 259,000 pounds of surplus grains designated by the Commodity Credit Corporation; and that without the assistance applied for under the Emergency Feed Program he would be unable to maintain his basic foundation herd; that each of such statements was false and known by Sell to be false; that Sell owned, controlled, or had the financial means to purchase a supply of feed sufficient to maintain his basic herd of livestock until March 1, 1956, did not need 259,000 pounds of surplus grains, and was able to maintain his basic herd of livestock without the assistance applied for; that based upon such representations Sell's application was approved for 156,400

pounds of surplus grains and he was issued Farmers Purchase Orders No. 147 and No. 148 by the Greeley County Committee; that Sell purchased from the Greeley County Grain Co., Tribune, Kansas, 156,400 pounds of milo and submitted as partial payment therefor Farmers Purchase Orders No. 147 and No. 148 in the amount of $782 each; and that as the result of Sell's false, fictitious and fraudulent application and claim for assistance, the United States was damaged in the amount of $1,564.

The pretrial order, approved by counsel for Sell, stated that the facts that Sell was an individual doing business in a ranching operation in Greeley County, Kansas; that Sell, at the time of the filing of his application for assistance, was not in the military or naval forces of the United States or in the militia called into or actually employed in the services of the United States; that Sell filed on January 1, 1956, an application under the 1955 Emergency Feed Program for drought emergency feed with the Greeley County Farmers Home Administration; that his application was approved for 156,400 pounds of designated surplus grains by the Greeley County Farmers Home Administration; and that Sell received benefits therefrom in the amount of $1,564, were uncontroverted.

The motion for summary judgment of the United States was made on the ground that as the result of the judgment in case No. 7468 Sell was estopped from denying the facts determined therein and that, therefore, there was no genuine issue as to any material fact in the case. Attached to the Government's motion were copies of the indictment, findings and conclusions of the court, and judgment and order of probation in case No. 7468.

After a hearing on the motions for summary judgment the court found that all issues of fact in the first cause of action of the United States had either been admitted or previously determined in case

---

3. Doe v. United States, 8 Cir., 253 F. 903, 906; Laws v. United States, 10 Cir., 66 F.2d 870, 872; 22 C.J.S. Criminal Law § 35, p. 121.

No. 7468 and that therefore there were no genuine issues of material fact remaining to be determined. The judgment entered in favor of the United States for $5,128 represented a $2,000 forfeiture and double the damages of $1,564.

The False Claims Act, 31 U.S.C.A. § 231 et seq., provides in material part as follows:

"Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; * * *."

▇▇▇ Sell contends that applications for assistance under the 1955 Emergency Feed Program do not come within the purview of the False Claims Act. We do not agree.

In Rainwater v. United States, 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996, the Supreme Court held that the Commodity Credit Corporation "is a part of 'the Government of the United States' for purposes of the False Claims Act,"[4] and we are of the opinion that Sell's application of January 1, 1956, was a "claim" as contemplated by the Act.

In United States v. Borth, 10 Cir., 266 F.2d 521, this court held that a false

statement of an honorably discharged veteran of the Armed Services of the United States, made for the purpose of obtaining admission and free medical treatment in a Veteran's Administration Hospital, did not create a liability under the False Claims Act. This court in its opinion in Borth quoted the following from United States v. Tieger, 3 Cir., 234 F.2d 589, 591, which was quoted with approval in United States v. McNinch, 356 U.S. 595, 598, 599, 78 S.Ct. 950, 952:

"'* * * "the conception of a claim against the government normally connotes a demand for money or for some transfer of public property. * * *"'"

and further, at page 523, said:

"The application of the defendant sought no money or property of the Government. Its acceptance entitled him to free hospital service and medical care, but in no sense, to money or property. Of course this service had a value and was furnished by the United States at a substantial cost, but an application for this service was no more a claim for money or property than was the application for F.H.A. credit insurance in the McNinch case."

In the instant case, unlike the Borth case, the purpose of the claim was to obtain property. The Purchase Orders received by Sell as the result of his application were fully negotiable through any authorized feed dealer and were valuable items of property which, upon issuance, caused the Commodity Credit Corporation to "suffer immediate financial detriment,"[5] in that it became liable to redeem such Purchase Orders for Dealer Certificates, which, in turn, were redeemable for grain owned by Commodity Credit Corporation.

▇▇▇ The findings in the criminal case, No. 7468, were admissible in the civil case, No. 7518, under the doctrine of res judicata or estoppel by judgment, insofar

---

4. See also: United States v. McNinch, 356 U.S. 595, 596, 78 S.Ct. 950, 2 L.Ed.2d 1001.

5. United States v. McNinch, 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001.

as such findings determined issues identical to both cases.[6]

The allegations of the indictment in No. 7468 and the complaint, as amended, in No. 7518 show that the issues of fact, except those eliminated by the pretrial order, were substantially identical in both cases.

The elements necessary to establish liability under the False Claims Act are set forth in the statute and the existence of all of those elements was at issue and established in the criminal action, with the exception of the requirement of the False Claims Act that the claimant be a person "not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States." That element was established as an uncontroverted fact in the pretrial order, thus perfecting the Government's claim.

The damages sustained by the United States as the result of Sell's false claim were also established in the amount of $1,564 as an uncontroverted fact in the pretrial order.

Thus, the trial court properly determined that there were no genuine issues of material fact remaining in the first cause of action of the United States and properly granted the Government's motion for summary judgment.

During the course of the proceedings below, Sell made a motion for production of the minutes of the County Committee which considered his application of January 1, 1956, and for the transcript of the testimony of a member of that Committee before the Grand Jury which indicted Sell, for purposes of inspection, copying and photographing. Since the judgment in the criminal case and the issues therein determined and the admissions in the pretrial order conclusively established the Government's claim against Sell, as discussed above, Sell was in nowise prejudiced by not having his motion granted. There was no use to which he could have put any evidence he might have discovered, had his motion been granted.

The remaining contentions of Sell, that the court was without jurisdiction of the subject matter of the action and that the rules, regulations and statutes of the Emergency Feed Program were vague, indefinite and contradictory are without merit.

The judgments are severally affirmed.

---

6. Local 167 v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804; Emich Motors v. General Motors, 340 U.S. 558, 568, 569, 71 S.Ct. 408, 95 L.Ed. 1345.