UNITED STATES of America,
Plaintiff–Appellee,

v.

Yvon NAZON, M.D.,
Defendant–Appellant.

No. 90–2109.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1991.

Decided Aug. 15, 1991.

Andrew B. Baker, Jr. (argued), Philip P. Simon, Asst. U.S. Attys., Dyer, Ind., for plaintiff-appellee.

Allan A. Ackerman, Joelle Hollander (argued), Matthias A. Lydon, Jayne Carr Thompson, Lydon & Griffin, Chicago, Ill., for defendant-appellant.

Before WOOD, Jr., POSNER, and MANION, Circuit Judges.

MANION, Circuit Judge.

Dr. Yvon Nazon was indicted and convicted by a jury of 17 counts of fraud for his submission of false claims to Medicaid seeking payment for services not performed. Dr. Nazon appeals the decision claiming (a) that the district court erroneously gave the jury a "conscious avoidance" instruction which thereby permitted the jury to convict him on an impermissible basis, and (b) that the trial court failed to instruct the jury with a definition of "intent to defraud," the omission of which gave the jury a distorted and thus prejudicial understanding of the crime's degree of culpability.

We have reviewed the law applicable to this case and affirm the district court.

A. *Facts*

Dr. Yvon Nazon had been a Medicaid provider for the State of Indiana since 1971. He had offices in both Gary, Indiana, and Chicago, Illinois. Dr. Nazon participated in the Medicaid program as an obstetrician/gynecologist utilizing Method-

ist Hospital in Gary, Indiana as a surgery base. Medicaid is, of course, funded substantially by the federal government and is administered in Indiana by the Indiana Department of Public Welfare and Blue Cross/Blue Shield of Indiana. Dr. Nazon was accused and convicted of filing false claims against the Medicaid system, charging Medicaid thousands of dollars for unperformed services. To better understand the nature of his offenses and how his fraudulent activities were detected, some background information concerning the Medicaid system may be helpful.

Doctors who wish to provide services to patients whose care is covered by Medicaid must first sign a provider agreement. Dr. Nazon signed such an agreement where he certified that all information contained in his submitted billings to Medicaid would be "true, accurate and complete."

As is customary for all new enrollees to the Medicaid program, Dr. Nazon was issued a health care provider manual which lists the type of services that can be billed to Medicaid. In addition to listing the services Medicaid will cover, the manual informs the doctor on how to bill the Medicaid program and how to fill out claim forms. This manual is periodically updated via bulletins alerting Medicaid providers to changes in the scope of Medicaid coverage and billing procedures. Doctors who participate in the Medicaid program can get particularized help with questions concerning what and whom Medicaid covers, and answers relating to billing questions, by calling a toll-free "800" number. Doctors may also write to Medicaid for specific guidance. Trial evidence revealed that Dr. Nazon's staff occasionally used these services.

Blue Cross/Blue Shield administers the Medicaid program within Indiana. When a Medicaid claim form is submitted by a doctor for payment, the form is checked to verify that the patient is eligible for Medicaid, and that the doctor is a qualified Medicaid provider. The claim is also checked to establish the proper price for the procedure. Medicaid depends heavily on the medical provider's honesty and integrity in filling out claim forms. However, Medicaid does have some limited ability to detect provider billing practices inconsistent with Medicaid requirements.

In 1980, the Indiana Department of Public Welfare conducted a desk audit of some Medicaid claims filed by Dr. Nazon, which suggested that he was engaged in a continuous practice of irregular billing. The matter was referred to Blue Cross/Blue Shield's post-payment investigation group which conducted a full-fledged audit of Dr. Nazon's billing practices. The audit revealed that Dr. Nazon was billing Medicaid for patients' prenatal care, prenatal office visits and gonorrhea cultures contrary to Medicaid's prescribed policies. Medicaid does not permit the doctor to charge for any individual patient visit for prenatal care—rather, the attending doctor is awarded one lump sum for his services after the patient has completed delivery of her baby. Dr. Nazon was charging Medicaid for each pregnant patient's visit (often disguising the visit's prenatal purpose on the claim form) *and* collecting the lump sum fee after delivery. The cumulative payments by Medicaid were clearly more than Dr. Nazon was due under Medicaid rules. In addition, Dr. Nazon was billing Medicaid for gonorrhea cultures which were actually collected and analyzed for Dr. Nazon free of charge by a clinic funded by the State of Indiana. On five occasions prior to the 1980 audit, Medicaid alerted Dr. Nazon as to proper billing procedures concerning prenatal office visits. During the course of the two-day audit in 1980, Medicaid again criticized these specific unpermitted billing practices, but Dr. Nazon did not follow the auditors' admonitions. He continued to bill for individual visits as before.

As a result of the 1980 audit, a demand-for-refund letter was sent to Dr. Nazon by the Indiana Department of Public Welfare (IDPW) requesting a $13,000 refund. In response, Dr. Nazon requested a meeting with Blue Cross/Blue Shield and IDPW investigators to review the disputed charges. A meeting was arranged, but Dr. Nazon failed to attend. The record is devoid of any resolution to this demand or

any indication concerning whether any further collection efforts were pursued.

Six years later in 1986, Dr. Nazon was *again* the subject of an audit by Blue Cross/Blue Shield of Indiana. The focus of this audit was Dr. Nazon's practice of billing Medicaid for assistant surgeon fees where no assistant was present during the surgery. The audit also explored Dr. Nazon's habit of billing lab fees for services not provided by his office.

During the audit, investigators discovered that Dr. Nazon was routinely billing Medicaid for assistant surgeon fees where documentation suggested that no assistant surgeons were present during Dr. Nazon's operations. Apparently, sometime in 1985 Dr. Nazon discovered that he could bill Medicaid for an assistant surgeon when the operation involved the opening of the abdomen. This discovery prompted Dr. Nazon to order his staff to go back and pull records from the preceding three years and search for surgeries where the abdomen was opened and then bill Medicaid for an assistant surgeon in those cases. Former employees of Dr. Nazon testified that the doctor instructed them to alter operation reports to reflect the presence of an assistant when one was not there. Dr. Nazon also instructed them to modify operation reports to reflect that Dr. Nazon was principal surgeon assisted by an assistant when in fact the surgery was performed by the "assistant" unassisted. He instructed the staff to retroactively bill for assistant surgeon fees relating to surgeries up to three years old (Medicaid generally will not pay for unclaimed surgical expenses or fees older than one year—Dr. Nazon was alerted to this restriction but instructed his billing staff to ignore it). Dr. Nazon would also bill Medicaid for the services of an assisting resident who was fully paid by the hospital, not by Dr. Nazon. This resulted in Medicaid being billed twice for the assistant's work: once legitimately by the hospital as proper reimbursement, and once illegitimately by Dr. Nazon. Testimony at trial revealed that Dr. Nazon would review and sign the false claims for assistant surgeon fees prior to submitting them to Medicaid.

The 1986 audit also revealed that in 1985 Dr. Nazon began using Clinical Diagnostic, Inc. as his outside laboratory to conduct tests and analyze patient specimens. Dr. Nazon would submit patients' specimens from his office to Clinical Diagnostics without the patients' Medicaid numbers, thereby preventing the laboratory from charging Medicaid directly for the tests as required by the Medicaid manual. Clinical Diagnostics would have no choice but to charge Dr. Nazon (usually around $12 to $20 per test). In order to attract Dr. Nazon's considerable business, Clinical Diagnostics discounted the lab fee charges. Dr. Nazon would then pay Clinical Diagnostics directly but turn around and bill Medicaid as if he had done the required test in his office (usually charging Medicaid $95 to $120 a test). This way, Dr. Nazon was impermissibly billing Medicaid at inflated rates for work he did not perform.

At the conclusion of this 1986 audit of his billing practices, Medicaid apprised Dr. Nazon of the auditors' findings and instructed that these billing practices were abusive, unpermitted and must be discontinued. Dr. Nazon was told that he could not bill Medicaid for an assistant surgeon when no one assisted, and that work performed by an independent lab had to be billed by the lab directly. (See § M 2320.11 of Indiana Medicaid Provider Manual.) The discussions were to no avail. Later, in October 1987, an agent from the Federal Bureau of Investigation confronted Dr. Nazon, during yet another investigation of his Medicaid billing methods, with evidence of further improper billings for laboratory tests which he and his office did not perform—billings submitted well after the 1986 audit and its consequential warnings.

Dr. Nazon continually explained to investigators (and at trial) that he had not read the Medicaid provider's manual instructing doctors as to what Medicaid covers and at what price. He claimed that he simply billed Medicaid what he thought he deserved for his services. His justification for submitting Medicaid claims relating to laboratory analyses he never performed was that he had overhead to cover and that

such charges were the "moral" compensation for his analysis of the lab's test results. In justifying his billing to Medicaid for assistant surgeon fees when the assistant was really a resident being paid by the hospital, Dr. Nazon stated that it was his philosophy that he was entitled to the money because he was taking time to teach the residents. With respect to filing claims for non-attending assistants, Dr. Nazon explained that he was entitled to bill for an assistant (even though an assistant was not present during the operation) because he had an assistant on his clinic's staff whose salary had to be paid regardless of whether she assisted the doctor or not. Former employees of Dr. Nazon testified that they routinely tried to restrain Dr. Nazon from his practice of deceptive billings, notifying him of salient Medicaid rules and requirements. Their efforts were unavailing—Dr. Nazon always insisted on a manner of billing that was inflated and deceptive.

Finally, on October 13, 1989, a grand jury handed down a 17–count indictment for violations of 18 U.S.C. § 287 ("false, fictitious and fraudulent claims"). The indictment, which alleged that Dr. Nazon defrauded Medicaid by submitting false claims, was divided into two distinct parts. Counts one through eight dealt with Dr. Nazon's false claims for assistant surgeon fees when an assistant was not present in the operating room or the assistant was a resident being paid by the hospital. Counts 9 through 17 dealt with false claims filed by Dr. Nazon with Medicaid for laboratory fees. Those counts allege that Dr. Nazon submitted false claims with Medicaid for fees relating to laboratory tests knowing that the tests were never performed by his office.

After a two-day trial, the jury returned guilty verdicts on all 17 counts charged in the indictment. Dr. Nazon was sentenced to five years probation, work release, community service, a $51,000 fine, and restitution.

### B. Discussion

Dr. Nazon appeals his conviction on two grounds, both stemming from purported errors and deficiencies in the court's final instructions to the jury. First, Dr. Nazon claims it was reversible error for the court to give a knowledge instruction which included a conscious avoidance provision. Next, Dr. Nazon argues that, although the court instructed the jury that intent to defraud was an element of the offense, the court erred in failing to offer a definition of "intent to defraud" for the jury's consideration. These issues will be explored sequentially.

### 1. Conscious avoidance instruction

■ Dr. Nazon was tried for violating 18 U.S.C. § 287 for filing false claims upon the United States. Section 287 reads:

§ 287. False, fictitious or fraudulent claims

Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, *knowing* such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine.... (Emphasis added.)

At the conclusion of Dr. Nazon's trial, the court gave the following "conscious avoidance" instruction relating to the legal meaning of "knowingly" necessary for culpability under § 287.

When the word "knowingly" is used in these instructions, it means that a defendant realized what he was doing and was aware of the nature of his or her conduct, and did not act through ignorance, mistake, or accident. Knowledge may be proven by the defendant's conduct and by all the facts and circumstances surrounding the case. *You may infer knowledge from a combination of suspicion and indifference to the truth.* If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, *yet shut his eyes for fear of what he would learn, you may conclude that he acted "knowing-*

*ly"*, as I have used the word. (Emphasis added.)

An appeals court, in ruling on the district court's decision to give a conscious avoidance instruction, "must review the evidence and any reasonable inferences that can be drawn from the evidence in the light most favorable to the government." *United States v. Bigelow*, 914 F.2d 966, 970 (7th Cir.1990); *United States v. Talkington*, 875 F.2d 591, 596 (7th Cir.1989).

The language used in the district court's instruction was developed by this court in *United States v. Ramsey*, 785 F.2d 184, 190–191 (7th Cir.1986). In *Ramsey*, we noted that every circuit has approved some form of "conscious avoidance" instruction. 785 F.2d at 189 (citing cases). Since that case, we have continually approved the use of that language. See *Bigelow*, 914 F.2d at 970; *United States v. Diaz*, 864 F.2d 544 (7th Cir.1988). While we have warned that "this instruction should be given only when it addresses an issue reasonably raised by the evidence," *Diaz*, 864 F.2d at 549, a conscious avoidance instruction is appropriate when a defendant "claims a lack of guilty knowledge" and where "there are facts and evidence which support an inference of deliberate ignorance." *Talkington*, 875 F.2d at 596.

Viewing the evidence in the light most favorable to the government, and in light of the guidance cited from *Diaz* and *Talkington*, there was ample basis for the "conscious avoidance" instruction in this case. Dr. Nazon repeatedly stressed at trial that he had no "guilty knowledge" concerning his billing practices. Furthermore, there was substantial evidence that Dr. Nazon deliberately ignored the fact that false claims were being submitted by his office.

Dr. Nazon's defense to the indictment was that he lacked a guilty mind; that is, he only billed Medicaid for what he thought he was owed, for what he thought he deserved, and therefore for what he thought Medicaid should pay. Actually, Dr. Nazon's argument is inconsistent if not self-destructive. He acknowledges in his brief and at oral argument that his claims to Medicaid often did *not* truthfully reflect (a) the services rendered, or (b) the manner in which services were rendered. However, since Dr. Nazon claimed no familiarity with the Medicaid provider manual (and its attendant restrictions and prohibitions), he contends that he did not know the charged billing practices were actually forbidden. He explained that the claim forms he submitted reflected what he felt he should receive from the government for his services—and since he believed that he should receive the requested sum, Dr. Nazon believed that Medicaid would have no reasonable basis to deny the request.

This argument is disingenuous at best. The truly relevant consideration from the point of view of any reasonably intelligent Medicaid provider is *not* what the doctor feels is morally adequate compensation, but what services Congress has agreed to fund through the Medicaid system. In exchange for accepting a large volume of Medicaid guaranteed business, a provider is bound by the charging and billing procedure and schedule mandated by Medicaid. It is difficult to reconcile Dr. Nazon's "good faith" belief that Medicaid should accept his admittedly false claims with his having signed a provider agreement with Medicaid in which Medicaid insists that the doctor's claims be "true [and] accurate...." The requirement that Dr. Nazon report "true [and] accurate" claims imposes a duty on the doctor to closely monitor evolving Medicaid requirements as outlined in the manual, and conform his billing habits thereto. This duty, coupled with evidence demonstrating the doctor's opportunity to learn the truth about proper Medicaid billing procedures, is strong support for the imposition of a "conscious avoidance" instruction. And, indeed, Dr. Nazon had significant opportunity to learn of the impermissibility of his billing practices. He was repeatedly alerted, formally and informally, by Blue Cross/Blue Shield, by IDPW, by the FBI, and by his own staff that his proposed method of billing Medicaid was improper and illegal. Nevertheless, despite these serious warnings, Dr. Nazon continued his errant billing practices. Dr. Nazon knew from experience that Medicaid renounced false claims. In fact,

the doctor's claim of "no guilty knowledge" looks incredibly hollow. Nevertheless, the extent of Dr. Nazon's guilty knowledge concerning his alleged activities was certainly at issue in this case, partially satisfying the requirements for a "conscious avoidance" instruction.

In addition to the fact that the defendant's guilty knowledge (or his expressed lack thereof) was explicitly made an issue in this case, the "conscious avoidance" instruction is further justified by evidence of Dr. Nazon's deliberate ignorance. Throughout the trial, Dr. Nazon's defense was that he was ignorant of the billing procedures for Medicaid and that his office staff handled the billing. He claimed never to have examined the Medicaid provider's manual which clearly set out requirements contrary to his office practices. He also claimed that he left it to his staff to figure out Medicaid procedures and bill accordingly. At trial, Dr. Nazon tried to disguise his deliberate disregard of Medicaid rules by justifying or excusing his charges based on his "personal philosophy" or "billing what he thought he deserved," or "clerical problems," or "computer errors." These are all untenable bases for the doctor's failure to live up to his duty to familiarize himself with the Medicaid requirements and observe his legal duty to submit truthful claims. His deliberate avoidance of familiarizing himself with the rules, conditions, and law controlling his claim submissions is strongly supported by the evidence at trial. This fact, in conjunction with his "no guilty knowledge" defense, is strong grounds to offer a "conscious avoidance" instruction. The district court was correct on this point.

### 2. Intent to defraud definition

■ The district court instructed the jury that in order to find the defendant guilty of violating 18 U.S.C. § 287, it must find:

First, that the defendant made or presented a claim against a department or agency of the United States;

Second, that the claim was false, fictitious, or fraudulent;

Third, that the defendant knew the claim was false, fictitious or fraudulent; and,

Fourth, that the defendant submitted the claim with the intent to defraud.

■ The district court defined "knowledge" (see p. 265, *supra*) but did not instruct the jury as to the meaning of "intent to defraud." Dr. Nazon, in his brief on appeal, raises this omission as reversible error. Dr. Nazon contends that the failure of the trial court to define "intent to defraud" allowed the jury to convict him on a lesser *mens rea* than necessary to sustain a conviction for the crime of which he is accused. However, defense counsel at trial did not proffer a specific intent instruction defining intent nor did he object to the court's omission of such a definition. Because a timely objection was not made at trial to the omission of a non-proffered definition of "intent to defraud," Dr. Nazon has waived his objection to such omission on appeal. *United States v. Macias*, 930 F.2d 567, 572 (7th Cir.1991), and *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988). Nor was the failure to define "intent to defraud" plain error. Plain error occurs when, in light of the entire record, the instruction in question had a probable impact upon the finding of guilt. *United States v. Andrus*, 775 F.2d 825, 852 (7th Cir.1985). "In other words, the plain-error exception to the contemporaneous objection rule is to be used 'sparingly, solely in the circumstances in which a miscarriage of justice would otherwise result.'" *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citations omitted).

The evidence clearly established that Dr. Nazon's office submitted false claims with Medicaid and such claims were being filed at Dr. Nazon's direction with his supervision, or he kept himself deliberately ignorant of precise billing procedures to possibly excuse his inflated billing practices. As a result the excess Medicaid payments kept pouring in. The strength of the evidence submitted at trial (i.e., the number of false claims, the number of audits, the number of warnings, and testimony of Dr.

Nazon's staff corroborating the government's charges) overcomes any concern that the omission of the "intent to defraud" definition had any prejudicial impact on the jury.

For the foregoing reasons, the verdict is AFFIRMED.