**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James CATTON, Defendant–Appellant.**

**No. 95–2622.**

United States Court of Appeals,
Seventh Circuit.

Argued May 24, 1996.

Decided July 11, 1996.

388

Bradley W. Murphy, Office of the United States Attorney, Peoria, IL, Timothy Bass (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee.

Richard H. Parsons, Peoria, IL, Daniel G. O'Day, Cusack, Fleming, Gilfillan & O'Day, Peoria, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

A jury convicted James Catton of submitting five false claims to the Federal Crop Insurance Corporation, in violation of 18 U.S.C. § 287, and the judge sentenced him to 21 months in prison. Section 287 makes it a crime to file a "false, fictitious, or fraudulent claim" with a federal agency. Unlike 18 U.S.C. § 1001, which makes it a crime to file a false *statement* with a federal agency, section 287 makes the imposition of a prison sentence on a convicted defendant mandatory, perhaps because a claim, as distinct from a statement, always seeks money. At all events, this is the first reported case that we have found in which the government has invoked section 287 against a false claim for proceeds of crop insurance. All the other reported cases (and there aren't many) of criminal prosecutions for false claims of crop insurance have been brought under section 1001, see, e.g., *United States v. Simpson,* 995 F.2d 109 (7th Cir.1993); *United States v. Land,* 877 F.2d 17 (8th Cir.1989), with one exception, *Sell v. United States,* 336 F.2d 467 (10th Cir.1964) (15 U.S.C. § 714m(a)).

■ Catton, a farmer in northern Peoria County, Illinois, claimed to have lost a large part of his crop of hybrid seed corn in 1989 on account of drought. The FCIC rejected the claims. Catton had a poor crop, all right, but the government presented the testimony of several expert witnesses that his losses had been due not to drought but instead to Catton's "pathetic farming practices," as the prosecutor put it in closing argument. Catton presented testimony by other expert witnesses both that drought had caused his losses and that his farming practices were sound and consistent with the FCIC's rules. He seeks a new trial on the basis of false statements made by the prosecutor in closing argument and perjury committed by one of the government's expert witnesses with the government's knowledge. He does not emphasize that knowledge, perhaps because of doubt that it can be imputed to the prosecutor; for it was the knowledge of an investigator, and it is unclear how far the knowledge of government employees involved in a case but not employed in the prosecutor's office is to be imputed to the prosecution. 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 19.5, p. 533 n. 9 (1984). The question whether the government *knowingly* used false or perjured testimony would be important only if Catton were trying to establish a constitutional violation. In a direct appeal from a criminal judgment rather than a collateral attack upon it, a showing that the trial was infected by false testimony need not rise to the level of a constitutional violation in order to be a ground for a new trial. It is enough if the jury might have reached a different conclusion had the testimony not been given (or had the jury known that it was false), provided that the defendant cannot be faulted for not having discovered the falsity earlier. *United States v. Reed,* 986 F.2d 191, 192–93 (7th Cir.1993).

Hybrid corn is produced by planting male and female seeds in a sequence that enables the male plant to pollinate the female. It is important that the male seeds be planted within a prescribed number of days after the female seeds (the number depending on the precise variety of seed that the grower has planted), although there is disagreement within the agricultural community over the correct number. The government argued that Catton had waited too long to plant the female seeds and then had allowed too much

time to elapse before he planted the males. The argument depended critically on the dates of planting, which were in dispute. In his closing argument the prosecutor repeatedly asserted that Catton had admitted that he had planted on the dates contended by the government. The government now concedes that the record contains no such admissions. Defense counsel objected to this portion of the closing argument, but the judge overruled the objection.

Hale, one of the government's expert witnesses, testified that as part of his research into growing conditions in northern Peoria County he had learned that Shissler Seed Company, which had six growing areas in that part of the county, had in 1989 obtained an average yield of hybrid seed corn of more than 30 bushels per acre. This was at least three times Catton's yield. The government asked the jury to infer from this discrepancy that Catton's loss couldn't have been due to drought, since a drought would have had as catastrophic an effect on Shissler as on Catton given the proximity of its fields to Catton's. On cross-examination Hale was asked whether it was an accurate characterization of his testimony that he had "talked to somebody at" Shissler the previous day and had asked the person to send him the figures for Shissler's 1989 crop yields. Hale said that this was accurate. It was not. He had never talked to anybody at Shissler. Instead a government agent had asked Shissler to fax the agent Shissler's 1989 figures for just the six growing areas in northern Peoria County. Shissler had complied by fax and the agent had given Hale the fax and Hale had then averaged the yields for the six areas shown on the fax.

The agent appears to have known (although the record is unclear on this) that Shissler, like Catton, had filed drought claims for 1989, that some of these claims had been paid, that Shissler had four growing areas just across the county line, in Knox County, only six miles from Catton's farm, and that Shissler's 1989 yields from these areas had been meager—perhaps even lower than Catton's—though as far as the record shows these areas were as close to Catton's farm as its Peoria County growing areas

were, and maybe closer. None of this information was in the fax or, so far as appears, otherwise known to Hale. The prosecutor sat by in silence while Hale lied about having communicated with Shissler, even though the agent who had given the fax to Hale was sitting beside the prosecutor. (And it *was* a lie. Hale could not have been under the misapprehension that he had spoken to someone from Shissler the previous day. The district judge's finding that Hale's testimony was *not* deliberately false is manifestly untenable.) The fax was not shown to the defense during the trial. The lie was not exposed until after the trial ended, when Catton's lawyer presented, in support of his unsuccessful motion for a new trial, a statement from the employee of Shissler who had faxed the government agent. The agent corroborated the employee's statement. The government does not argue that Catton should have learned about the lie earlier.

■ The prosecutor's misstatements of fact in the closing argument, and the false testimony by his witness Hale, require a new trial only if they were prejudicial. They would not be either if they were insignificant in themselves because concerned with facts peripheral to the issue of Catton's guilt or to the credibility of an important witness, or if the untainted evidence of guilt was so overwhelming that the errors could not have affected the outcome of the trial. *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995), and cases cited there. Neither condition is satisfied, especially when the errors are weighed jointly, as of course they should be. *United States v. Williams*, 81 F.3d 1434, 1443–44 (7th Cir.1996).

The evidence concerning the planting dates was important because, while the government alleged a host of improper farming practices, the evidence concerning them was both technical and contested. There were expert witnesses galore, but a clash of experts is likely to leave a jury dizzy, and so provide an insecure foundation for a finding of guilt beyond a reasonable doubt. The government's experts said that Catton should not have planted a row of male plants between two rows of female plants, because the females would consume moisture and nu-

trients needed by the fragile (because newly planted) males. Yet interplanting is permitted by the FCIC's rules, and Hale himself acknowledged that the concerns that he and other experts have about interplanting are recent. Perhaps too recent to be reflected in the rules or to have become the established practice of all honest growers of corn. The government's experts said that Catton should have detassled the females by hand, rather than using a mechanical detassler, which does a less thorough job. The tassels produce pollen, so if the female plant's tassels are not removed they may pollinate other female plants, and the resulting kernels will not be hybrids. But while this is a bad farming practice, it does not reduce the gross number of bushels per acre, so it cannot explain why Catton's yield, which was computed without regard to the sex of the plants, was so low. The government's experts testified that Catton drove his combine too fast in harvesting the corn. But there was evidence that he did this on only one of his cornfields, so it could not have explained the poor yields of the others.

One thing on which everyone agreed, however, is that it is crucial not to plant the males too long after the females, and if the government was right about the planting dates Catton had indeed waited too long to plant the males (although there was, as we mentioned, some dispute over how long is too long). So it is no surprise that the prosecutor highlighted this point in his closing argument. But by falsely stating that there was evidence that Catton had admitted to the dates contended for by the government, he implied that Catton had admitted guilt. The centrality of the evidence concerning the date of planting the males is shown by one of the notes that the jury sent out to the judge during its deliberations: "We cannot reach a verdict on Counts 1, 2, 3, 4, and 6 [a list that includes four of the five counts on which Catton was convicted] unless we have the information regarding male planting time. These were alluded to in closing arguments and it was stated would be available to us for use during our deliberations. We cannot find this info." The judge did not furnish any information in response to this note (or to an earlier note asking, in the same vein,

"Was there testimony for when the male seeds were planted?"). He told the jurors to rely on their "collective memory" and to keep deliberating.

As for the probable impact of Hale's false testimony on the jury, it is important to note that, like the planting dates, the evidence that another grower of the same crop in the same area had much larger yields than Catton stood forth from the welter of experts' disputations with pellucid simplicity. Had the evidence not been given, the government's case would have been significantly weakened. Or if during the trial the government had told defense counsel that Hale had testified falsely with regard to his communicating with Shissler, the defense could have used the lie with potentially devastating effect in its cross-examination of Hale. Exposure of the lie would have undermined the substance of Hale's testimony as well as his personal credibility, by revealing that he had relied on data filtered (as he may not have realized) by the government, possibly in an effort to predetermine his expert opinion. Hale's false testimony, incidentally, masked significant favorable evidence (so there may be a *Brady* violation here on top of everything else, see *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), though we need not pursue the point). Had the jury known that Shissler had made drought claims—which the FCIC paid—for losses of the same crop in the same area and same year as Catton's loss, not only would it not have inferred that Catton's claim of drought was false from the experience of Shissler's Peoria County fields, fields that for all the record discloses are farther from Catton's farm than Shissler's Knox County fields; it might have thought Shissler's experience in Knox County—poor yields and paid drought claims—supported Catton's defense that he too had been done in by drought.

The government's brief highlights Hale's evidence. It barely mentions the testimony of the other expert witnesses. Hale's testimony would in all likelihood have been both less favorable to the government and less likely to be believed if the route by which the evidence about Shissler had gotten into his hands had been exposed.

The government argues that the untainted evidence of Catton's guilt was so strong that neither the prosecutor's false statements in closing argument nor Hale's false testimony mattered. Yet while asserting this the government's brief does not pinpoint the flaws in the detailed analysis of the evidence in Catton's opening brief. There Catton asserts with considerable specificity that every material contention made by the government's expert witnesses was either contested or explained away by his own witnesses, with the possible exception of the contention that his weed control was poor. It would have helped us in evaluating Catton's characterization of the evidence if he had included complete record references in his brief, as he should have done. 7th Cir. R. 28(d)(2). Yet as the government's brief does not complain about the inadequate referencing or discuss any of his specific claims concerning the evidence, and as we find the transcript of the trial confusing at best, we conclude that the case was a close one. It is true that the FCIC, suspicious of Catton because he had submitted high claims of loss due to drought in previous years, conducted inspections of his farm, complete with videotaping, during the 1989 growing season. Videotapes have put many a case on ice. See, e.g., *United States v. Torres*, 751 F.2d 875 (7th Cir.1984). The videotapes were shown to the jury, and the government's witnesses, interpreting the videotapes, pointed out that only the male plants were stunted and shriveled—the females were standing tall—and the prosecutor asked rhetorically how a drought could have spared the females. But that is a question of agricultural science, on which the parties' experts disagreed. The females may have survived the drought better because, having been planted earlier than the males, they were sturdier. The jury sent in a series of notes to the district judge, and deliberated for many hours; and the judge himself thought the case sufficiently close to admit Catton to bond pending appeal. A further point is that Catton knew that he was being videotaped, yet submitted the allegedly false claims anyway, indicating (though not proving) a lack of consciousness of guilt.

Another thing that makes the case close is the government's insistence, at first glance otiose, that Catton *deliberately* ruined his crop. As the prosecutor put it in his closing argument, Catton "farmed for a loss from the beginning." Catton was not prosecuted for the agricultural equivalent of cruelty to animals or neglect or abuse of children. He was prosecuted for telling the FCIC that his crop had been ruined by drought rather than by poor farming practices. We can but speculate that the reason the government shouldered the difficult and unnecessary burden of proving that Catton had planned to fail from the beginning is that if he did not, it would be very difficult to show that his false statement to the FCIC had been knowing—that is, that he knew the claim was false. *United States v. Ferguson*, 793 F.2d 828, 831 (7th Cir.1986). "Drought" is an ill-specified concept. Spells of hot, dry weather in central Illinois during the summer are not unusual. A farmer is unlikely to be aware that he is a bad farmer, so if his crop fails he is likely to blame it on some external cause, such as the weather (in just the same way that many workers fired for cause do not believe it, and think there must be skullduggery afoot). His insurance claim would be false, and would be denied (Catton's was denied), but he could not easily be convicted of filing a *knowingly* false claim. It is not surprising that there have been so few reported cases of criminal prosecution for filing false claims for the proceeds of crop insurance.

So, to bolster its case that Catton had known his claim was false, the government undertook to prove that Catton had planned *from the beginning* to grow a ruined crop. But the government failed to assign any motive for such a plan. One can imagine a farmer's not planting any crop at all, and then filing a claim for the loss of the crop due to drought; or planting a crop but not spending the money necessary to grow it successfully, so that the payment of his insurance claim would yield him a higher profit than he could have gotten by selling a successful crop. But neither motive was argued by the government; nor that the FCIC pays farmers more than their actual losses, so that it is better to lose a crop and collect on the insurance than grow a good crop and sell it. So far as the record shows, Catton saved no

money by engaging in bad farming practices rather than good ones. As a result, there is very little evidence to support a contention—that Catton was engaged in fraud from the very outset of the growing season, months before he filed the allegedly false claims—that the government seems to have thought vital to persuading the jury to convict.

■ If Catton did not know that his claim was false, he could not have been acting willfully in submitting it, and although 18 U.S.C. § 287 (unlike section 1001) does not explicitly require proof of willfulness the judge here did, without objection by the government, give an instruction on willfulness. What "willfully" adds to "knowingly" in a section 287 case is obscure. Unlike a knowingly false statement, which if immaterial might not reflect a guilty intent, the making of a knowingly false *claim* might seem inherently willful, inherently intended to defraud, making an instruction on willfulness otiose. Yet several cases, including two in this circuit, assume that the defendant must be willful as well as knowing, that is, must intend to defraud the government. *United States v. Nazon,* 940 F.2d 255, 260 (7th Cir.1991); *United States v. Haddon,* 927 F.2d 942, 950–51 (7th Cir.1991); *United States v. Martin,* 772 F.2d 1442, 1444–45 (8th Cir.1985). These are assumptions, not holdings; so far as appears, the question whether willfulness is required to be proved in a section 287 case had not been raised. Our decision in *Ferguson,* which was not cited in *Nazon,* is emphatic that willfulness need not be proved. 793 F.2d at 831. All the decisions that we have found that actually discuss the issue agree with this. *United States v. Barker,* 942 F.2d 585, 588–89 (9th Cir.1991); *United States v. Irwin,* 654 F.2d 671, 681–82 (10th Cir.1981); *United States v. Milton,* 602 F.2d 231, 233–34 (9th Cir.1979). We think these decisions are correct. It is implicit in the filing of a knowingly false claim that the claimant intends to defraud the government, and hence unnecessary to charge willfulness separately. But this simply underscores the importance of the government's proving the defendant's knowledge that the claim is false.

As we said at the outset, there was enough evidence to convict Catton. But the evidence was not so one-sided that the false closing argument and false expert testimony can be disregarded. These errors may well have spelled the difference between conviction and acquittal. Without meaning to condone mixed metaphors, we cannot deny the aptness of the statement in the defendant's brief that "The Prosecutor drove a prosecutorial meat axe into the Appellant's day in court." The defendant is entitled to a new trial.

REVERSED.